IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

HAROLD PRICE,

       Plaintiff,

v.                                           CASE NO. 1:13-cv-250-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

_____/


## <u>REPORT & RECOMMENDATION</u>

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for a period of disability, disability insurance benefits, and supplemental security income.  (Doc. 1.)  The Commissioner has answered, and both parties have filed briefs outlining their respective positions.  (Docs. 10, 12, 13.)  For the reasons discussed below, the Commissioner's decision is due to be affirmed.

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits, and supplemental security income on October 11, 2006, alleging disability beginning December 15, 2005.  (R. 254-56; 260-61.)  Plaintiff's applications were denied initially and upon reconsideration.  (R. 125-32; 148-53; 161-65.)

At Plaintiff's request, a hearing was held before Administrative Law Judge ("ALJ") Chester Senf, who issued a written decision dated October 30, 2009, finding that

Plaintiff was not disabled.  (R. 136-143.)  Plaintiff asked the Appeals Council for review, and after review, the Appeals Council remanded the case back to the ALJ because no evidence had been obtained from a Vocational Expert (VE), which was necessary to clarify the effect of the assessed limitations on Plaintiff's occupational base.  (R. 144-47.)

Subsequently, ALJ Brendan Flanagan conducted a hearing during which Plaintiff testified.  (R. 46-92.)  On May 18, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled.  (R. 14-23.)  Plaintiff again requested review of the ALJ's decision by the Appeals Council, which denied his request.  (R. 1-4.)  This appeal followed.  Plaintiff raises two issues: whether the ALJ committed error by failing to give "great weight" to Plaintiff's treating physician, and whether the ALJ's credibility finding is "meaningless boilerplate."  (Doc. 12.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1]  Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Commissioner's decision.[3]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]  However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6]  The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a claimant does not have any impairment or combination of impairments which

---

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

significantly limit his physical or mental ability to do basic work activities, then he does

not have a severe impairment and is not disabled.[10]   Third, if a claimant's impairments

meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is

disabled.[11]   Fourth, if a claimant's impairments do not prevent him from doing past

relevant work, he is not disabled.[12]   Fifth, if a claimant's impairments (considering his

residual functional capacity ("RFC"), age, education, and past work) prevent him from

doing other work that exists in the national economy, then he is disabled.[13]

  The burden of proof regarding the plaintiff's inability to perform past relevant work

initially lies with the plaintiff.[14]   The burden then temporarily shifts to the Commissioner to

demonstrate that "other work" which the claimant can perform currently exists in the

national economy.[15]   The Commissioner may satisfy this burden by pointing to the

Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a

---

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]   In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]   Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]   Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

**A.    Medical History**

Plaintiff has a history of rheumatic fever and previously underwent an aortic valve

---

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See id.*

replacement.  (R. 428; 507.)  Plaintiff was seen regularly at the Alachua County Health Department for medication management related to his heart condition.  Plaintiff was prescribed Coumadin and Penicillin and received regular blood work.  (R. 419-32; 457-8; 503-04; 508; 510-12.)

Plaintiff fell from a ladder on January 25, 2005, and fractured his left fifth metatarsal.  There was slight medial displacement of the distal fracture fragment.  (R. 433.)

In January 2007, Plaintiff treated at the Health Department for a painful right shoulder.  X-rays were ordered, and Plaintiff was prescribed Naproxen.  (R. 469.)  Dr. John Shahan opined that there were "minimal findings related to the rotator cuff."  (R. 489.)

On March 26, 2007, Plaintiff was seen by Dr. Eftim Adhami for a consultative examination.  Dr. Adhami noted that Plaintiff was obese but his heart had regular S1S2 sounds, without clicks, gallops, or murmurs.  Dr. Adhami also noted that Plaintiff had 5/5 muscle strength without atrophy, his deep tendon reflexes were normal, his ankles were normal, his walk on heels and toes was normal, his tandem walk was normal, and he did not need any assistive devices.  There was shoulder pain upon elevation above 100 degrees.  Dr. Adhami opined that x-rays may be helpful, but did not offer any opinion of any limitations that Plaintiff might have due to his pain or any other issues.  (R. 447-48.)

On April 9, 2007, State Agency Physician Nicholas Bancks completed a physical residual functional capacity assessment. Dr. Bancks found that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, could stand and/or walk for a total of six hours in an eight hour workday, sit for six hours in an eight-hour

workday, and had limited reaching in all directions.  He also opined that Plaintiff should only occasionally balance or stoop.  (R. 449-56.)

Right shoulder x-rays in July of 2007 showed a "normal right shoulder.  Minimal AC Hypertrophic change."  (R. 488.)  Follow up x-rays later that month showed tendinopathy of the right shoulder, but there was no evidence of a full thickness tear, and no abnormal thickening of the ligament.  (R. 486-87.)

Plaintiff returned to the Health Department on August 29, 2007 for his right shoulder pain.  No edema and no effusion were noted, and Plaintiff was referred to orthopedics.  Plaintiff was also counseled on his diet, exercise, and adherence to his treatment plan.  (R. 459-60.)

On November 2007, State Agency Physician Eric Puestow, M.D., completed a residual functional capacity assessment. Dr. Puestow opined that Plaintiff could occasionally lift fifty pounds, and frequently lift twenty-five pounds, stand about six hours in an eight-hour workday, sit for six hours in an eight-hour workday, could never climb ropes, ladders, and scaffolds, and was limited in his ability to reach in all directions.  Dr. Puestow also opined that Plaintiff should avoid concentrated exposure to hazards, such as machinery and heights.  (R. 490-97.)

Plaintiff complained of pain in his left ankle at a visit to the Health Department in October 2008, and x-rays were ordered.  (R. 509)  The x-rays showed mild to moderate degenerative changes of the ankle joint and associated soft tissue swelling.  Otherwise, the exam was negative and there was no evidence of acute osseous injury or malalignment.  (R. 526.)

On October 8, 2009, Dr. Colon, one of Plaintiff's physicians at the Health

Department, completed a Residual Functional Capacity Evaluation by Treating Physician Form, provided by Plaintiff's counsel.  Dr. Colon was asked to complete the form for the time period from December 15, 2005, to March 31, 2008.  Dr. Colon indicated on the form that Plaintiff was capable of sitting and working for three to four hours at one time, and could sit and work for a total of four to five hours  day, five days per week.  Dr. Colon opined that Plaintiff could stand and work for one to two hours at a time, and could stand and work for a total of one to two hours per day, five days a week.  Assuming Plaintiff had a sit/stand option, Dr. Colon estimated that Plaintiff could work for one to two hours per day, five days a week, and could lift twenty to thirty pounds frequently and occasionally.  Although given the space to support his checkbox opinions with clinical data, Dr. Colon did not do so.  (R. 405-08.)

Dr. Colon also filled out the same form for the time period from April 1, 2008, until October 9, 2009, the date of the form.  Dr. Colon opined that during this time period, Plaintiff was capable of sitting and working for three to four hours at a time, and could sit and work for four to five hours a day, five days a week.  He estimated that Plaintiff could stand and work for one to two hours at a time, and could stand and work for a total of one to two hours a day, five days a week.  With a sit/stand option, Dr. Colon believed that Plaintiff could work for a total of one to two hours a day, five days per week.  Dr. Colon maintained his opinion that Plaintiff could lift twenty to thirty pounds both frequently and occasionally.  Once again, Dr. Colon declined the opportunity to explain the basis for his opinions in the space provided.  (R. 409-12.)

Plaintiff presented to the Health Department in January of 2011 for a medication refill.  (R. 565.)  In June of 2011, Plaintiff called the Health Department because he had

misplaced his Coumadin, and had not taken it for about two weeks.  He was given a refill.  (R. 563.)  Plaintiff returned to the Health Department in November 2011, and reported shoulder pain.  He was given a refill of Flexeril.  (R. 548-50.)

Dr. Colon completed another Residual Functional Capacity Evaluation by Treating Physician Form on February 24, 2012. In this form Dr. Colon was requested to evaluate Plaintiff's function from October 10, 2009, until the date he signed the form.  He opined that Plaintiff could sit and work for thirty minutes at a time, and could sit and work for a total of one hour a day, five days per week.  He opined that Plaintiff could stand and work for thirty minutes at a time, and could stand and work for a total of one hour per day, five day per week.  He stated that if Plaintiff could sit or stand at will, he could work for a total of one hour per day, five days per week, could lift ten to fifteen pounds frequently and occasionally.  Dr. Colon explained that this was due to Plaintiff's joint pain because of his rheumatic fever.  (R. 608-610.)

Dr. Colon also completed a clinical assessment of pain by treating physician form on February 24, 2012.  Dr. Colon stated that Plaintiff has reported occasional pain, and from an objective standpoint, Plaintiff would be expected to have pain.  Dr. Colon opined that Plaintiff had marked limitations in the ability to complete a normal workday and workweek without interruptions from pain, and perform at a consistent pace without an unreasonable number and length of rest periods.  Although Dr. Colon reported that Plaintiff was reporting marked pain, he opined that objectively, he would rate Plaintiff's pain as mild. (R. 611-16.)

**B.   Hearing Testimony**

Plaintiff's hearing before the ALJ was originally scheduled for November 15,

2011, but because of a delay in obtaining medical records, it was rescheduled for November 18, 2011. (R. 93-107.)

Plaintiff testified that he currently lived with his aunt, and previously he lived with his mother.  He was not married and had four children, three of whom were adults. Plaintiff graduated from high school.  (R. 47-60.)

Plaintiff testified that he worked for a catering company part-time in the first half of 2011, while his applications were pending.  He set tables and ran food, and was paid about $7.50 or $8.00 an hour.  He stopped working because he could no longer perform the job due to his incarceration.  Plaintiff spent about three months in jail in 2011 due to driving and evidence tampering when an illegal substance was found in his car.  Plaintiff testified that he also spent some time in jail when he was younger, in his late twenties and early thirties.  Plaintiff stated that he had been arrested several times in the past for driving without a license, because it had been canceled due to child support non-payment.  (R. 60-64.)

When he was working at the catering company, Plaintiff generally worked about ten to twelve hours a week.  He would also help cleaning restrooms or perform other light duties in addition to his food service duties.  Plaintiff typically would be at work for three or four hours at a time.  He attempted to return to work there after his release from jail, but he was not permitted to resume work due to being a no-show previously.  (R. 64-66.)

Plaintiff stated that he was five foot nine, and weighed 290 pounds.  He did not smoke cigarettes, and only drank alcohol occasionally.  He had tried both marijuana and cocaine before, as recently as the prior year.  (R. 66-68.)

Plaintiff had past work experience part-time at Pizza Hut and full-time as a custodian, during the night shift at a school.  Plaintiff also stated he did roofing work and worked at McDonald's.  He also was employed at Hardee's and worked in the flooring business.  Plaintiff testified that although he was not working now, he had applied for a job as recently as the Monday before the hearing, but had not heard back yet.  Plaintiff currently had no income, though he had applied for food stamps.  (R. 60-71.)

Plaintiff treated with Dr. Colon at the Alachua County Health Department, although sometimes he would see other providers.  He was required to get regular blood tests there every three months.  Plaintiff testified that he had seen Dr. Colon probably six to eight times, which included "a couple of times" within the past few years, which the ALJ noted was consistent with his medical records.  (R. 71-73.)

Plaintiff testified that he could bathe and groom himself and that he could fix simple meals, such as hot dogs or noodles, and wash the dishes.  He also could do his own laundry and do light cleaning around the house, such as dusting or wiping down the table.  He generally went to bed around eleven thirty or midnight, and woke up around eight thirty in the morning.  Plaintiff testified that he took Naproxen for pain, and that it helped him to sleep.  He stated he generally took Naproxen four times a week. (R. 73-75.)

Plaintiff testified that on a typical day he usually tried to catch a ride somewhere so he could attempt to find employment because of his child support issues.  He stated that if it was not going to hurt his body – if it was within his limits – he would take a full time job and "try" it.  If he got to a point where he could not do the work, he would try to ask for light duty.  (R. 75-76.)

Plaintiff estimated that he could lift forty or forty-five pounds, and that when he worked in catering he was on his feet for almost the entire time, usually for around three and a half to four hours.  Plaintiff would need to take Naproxen after working.  (R. 76-77.)

Plaintiff testified that while he was in jail he maintained his Coumadin and Pen VK prescriptions, but he did not get anything for pain during that time because the doctors did not want him taking ibuprofen.  When he was in jail Plaintiff mostly read and watched TV during the day, but he also wiped down the tables after meals, and would walk around outside for a while.  (R. 78-80.)

Plaintiff visited his church, friend's homes, and businesses to put in job applications.  He would also go to the grocery store, and sometimes restaurants.  He liked to read novels for fun.  (R. 80-81.)

Plaintiff stated that he was unable to work because he had pain, mostly in his ankles when he stood up for too long, and he had a sharp pain in his chest and his shoulders from lifting.  He stated that he also had bad circulation.  (R. 81-82.)

The ALJ questioned Plaintiff about several notes in his records which disclosed that Plaintiff had missed taking his Coumadin or run out of medication.  The ALJ noted that these instances went back years.  Plaintiff responded that those instances related to losing his Mom, and that he would sometimes run out of medication.  He also explained that sometimes his doctors would tweak his medication levels and he would misunderstand how much he was supposed to take.  (R. 82-83.)

Upon questioning from his representative, Plaintiff further explained that he did not have health insurance, and had not had it for a long time.  To pay for his

prescriptions he would have to ask a friend for money, or try to do some odds and ends jobs for money.  Sometimes he did not have the money to pick up his prescription.  (R. 83-84.)

Plaintiff testified that he was unable to stretch his shoulder above his head "real high" and he struggled trying to lift something.  He said that since December of 2005 his energy level had diminished and he tired easily.  He also could not run like he used to, which impacted his catering job.  (R. 84-86.)

Plaintiff stated that his doctors wanted him to elevate his ankle because it swelled, and he would feel a burning sensation after too long.  He stated he tried to elevate his feet at least two or three times a day for about thirty or forty-five minutes.  (R. 86-87.)

A Vocational Expert (VE) also testified at the hearing.  The VE explained that Plaintiff had past relevant work as a caterer helper, which had an exertional level of light and an SVP of three.  He also had experience as a roofer helper, which was very heavy with an SVP of two.  He also worked as a janitor, which was a medium job with an SVP of two.  Plaintiff also worked as a short order cook, which is a light category with an SVP of three.  The ALJ noted that neither the catering job nor the short order cook job were performed at the SGA level.  (R. 87-88.)

The ALJ posed a hypothetical question to the VE. The ALJ asked the VE to assume the claimant was restricted to medium level work, could lift or carry fifty pounds occasionally, twenty-five pounds frequently, stand or walk six hours, and sit six hours in an eight-hour workday.  The claimant could never climb ropes, ladders, or scaffolds, and would be limited to frequent overhead or above the shoulder reaching with the right arm.

The claimant would also need to avoid hazards, moving mechanical parts, and heights. The VE testified that a claimant with those limitations would not be able to perform Plaintiff's past work.  (R. 88-89.)

In his next hypothetical question, the ALJ asked the VE to assume an individual with the same work experience, age, and education as Plaintiff, capable of working with the restrictions the ALJ posed in the first hypothetical, and asked whether there were any jobs such a person could perform in the regional or national economy.  The VE testified that there was work available in the national economy that such an individual could perform.  Some representative examples were a car washer, machine cleaner, and laundry laborer.  (R. 89-90.)

The ALJ then restricted the hypothetical individual to the inability to perform work at any exertional level for eight hours a day, forty hours per week, and asked whether there were any jobs that such a person could perform.  The VE testified that restriction would eliminate all jobs.  (R. 90.)

Plaintiff's attorney asked whether the jobs previously identified would accommodate a sit-stand option, and the VE testified they did not.  The VE testified, however, that with a sit/stand option such a person could still work as a ticket-taker, and ticket-seller.  However, if the individual required two additional breaks for about thirty minutes at a time, that would eliminate all jobs.  (R. 90-91.)

## C.    Findings of the ALJ

The ALJ found that Plaintiff met the insured status requirements through June 30, 2006, and had not engaged in substantial gainful activity since the alleged onset date. The ALJ found that Plaintiff had the severe impairments of rheumatic carditis, right

shoulder tendopathy, and degenerative joint disease of the left ankle.

The ALJ found that Plaintiff's impairments did not meet or equal a Listing, and the ALJ concluded that Plaintiff has the residual functional capacity to perform medium work, with the ability to lift or carry fifty pounds occasionally, and twenty-five pounds frequently, and is limited to sitting, standing or walking for six hours in an eight-hour workday.  Plaintiff could never climb ropes, ladders, and scaffolds, could occasionally balance, stoop, kneel, crawl, crouch, climb ramps and stairs, and engage in overhead reaching with his right arm.  He should avoid hazards including moving machinery and heights.

The ALJ determined that Plaintiff was not able to perform his past relevant work as a roofer helper or janitor. At step five of the sequential analysis the ALJ noted that Plaintiff was a younger individual with a high school education, and considering his age, education, work experience and residual functional capacity, there were jobs that existed in the national economy that Plaintiff could perform, such as car as car washer and laundry laborer.  Accordingly, the ALJ determined that Plaintiff was not disabled through the date of the decision.  (R. 14-23.)

## IV. DISCUSSION

**A.     The ALJ did not err by failing to give great weight to Dr. Colon's opinions.**

Plaintiff contends that the ALJ erred by failing to give "great weight" to the Alachua County Health Department physicians who treated Plaintiff, specifically Dr. Colon's opinion that Plaintiff was unable to work.  (Doc. 12 at 10.)

It is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is

shown to the contrary.[21]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[22]  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.[23]  Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[24]

In his written decision, the ALJ stated the following with respect to Dr. Colon's opinions:

> I have concluded that the opinions of John Colon, M.D., are not entitled to controlling or substantial weight because they are inconsistent with the objective medical evidence of record and not supported by the record as a whole.  Dr. Colon has opined that the claimant has a marked limitation in his ability to complete a normal workday and workweek without interruptions form pain.  Dr. Colon also opined that the claimant was only able to sit or stand or one hour per day, and lift a maximum of fifteen pounds.  The undersigned finds that Dr. Colon's opinions are completely unreliable because they are not consistent with the claimant's testimony and because Dr. Colon has only seen the claimant two times over the

---

[21] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)) ("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[22] 20 C.F.R. § 404.1527(d)(2).

[23] Edwards, 937 F.2d at 584 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

[24] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); see also Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir.1987).

course of the past two years.  Further, Dr. Colon's opinions are not
supported by his own records.  Examination notes by Dr. Colon from
March 2007 reflect that the claimant's ability to function was within normal
limits.  Dr. Colon's opinion that the claimant needs to elevate his feet is
not supported by his own treatment records, which fails to document any
such limitation.  Dr. Colon's opinions are also not supported by the
claimant's testimony regarding his recent work as a caterer, wherein he
was on his feet for hours at a time.

(R. 20.) (Citations omitted.)

As the ALJ expressly stated in the written decision, Dr. Colon's opinion regarding

Plaintiff's inability to work is conclusory and inconsistent with his own treatment records

and Plaintiff's testimony at the hearing.

One of the reasons the ALJ discounted Dr. Colon's decision was because Dr.

Colon's opinion that Plaintiff had marked limitation in his ability to complete a normal

workday and workweek was unsupported by Dr. Colon's own progress notes. For

example, in March 2007 Dr. Colon documented that Plaintiff's abilities to stand, sit,

walk, lift, carry, travel and socially interact were withing normal limits. (R. 443.)

The ALJ also relied upon the fact that Dr. Colon's assessment was inconsistent

with the treatment notes from other providers at the Health Department, which reflected

that Plaintiff's conditions were treated conservatively and were successfully managed

with non-narcotic medications, such as Flexeril and Naproxen. Further, other than the

checkbox forms completed by Dr. Colon his treatment notes do not reflect any

functional assessments that would support his opinion that Plaintiff was wholly unable

to work.

Lastly, Dr. Colon's checkbox opinions on the forms–which essentially opined that

Plaintiff was wholly unable to work–are at odds with the Plaintiff's own testimony. The

Plaintiff testified that he could lift forty to forty-five pounds. The Plaintiff testified that in the first part of 2011, while his disability applications were pending, he worked part-time at a catering company.  In this job Plaintiff testified that he was required to stand on his feet the entire time. While this work does not qualify as substantial gainful activity the ALJ appropriately pointed to this testimony in discounting Dr. Colon's opinions because the ability to perform this catering work is totally inconsistent with Dr. Colon's opinion that Plaintiff was unable to do any work.

In view of the conclusory and inconsistent nature of Dr. Colon's opinions, and the lack of treatment notes that would support such an opinion, the ALJ's decision to afford Dr. Colon's opinion no "controlling or substantial weight" is supported by substantial evidence. Accordingly, the Court concludes that the ALJ did not err in weighing the opinion evidence in this case

**B. The ALJ's credibility determination is supported by substantial evidence**.

A claimant may establish his disability through his own testimony of pain or other subjective symptoms.[25]  The ALJ must consider a claimant's testimony of pain and other subjective symptoms where the claimant meets the Eleventh Circuit's three-part "pain standard."[26]  Under that test, evidence of an underlying medical condition must exist.[27]  If that threshold is met, then there must be either objective medical evidence that confirms the severity of the alleged pain or symptoms arising from the underlying

---

[25] See Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005); Foote v. Chater, 67 F.3d 1553, 1560–61 (11th Cir.1995).

[26] See Foote, 67 F.3d at 1560.

[27] Id.

medical condition, or evidence that the objectively-determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain or symptoms.[28]   A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is sufficient to support a finding of disability.[29]

If the record shows that the claimant has a medically-determinable impairment that could reasonably be expected to produce his symptoms, the ALJ must evaluate the intensity and persistence of the symptoms in determining how they limit the claimant's capacity for work.[30]   In doing so, the ALJ considers all of the record, including the objective medical evidence, the claimant's history, and statements of the claimant and his doctors.[31]   The ALJ may consider other factors, such as: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of the claimant's medication; (5) any treatment other than medication; (6) any measures the claimant used to relieve his pain or symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to his pain or symptoms.[32]   The ALJ then will examine the claimant's statements regarding his symptoms in relation to all other evidence, and consider whether there are

---

[28] Id.

[29] Id. at 1561.

[30] 20 C.F.R. § 404.1529(c)(1).

[31] Id. § 404.1529(c)(1)-(2).

[32] Id. § 404.1529(c)(3).

any inconsistencies or conflicts between those statements and the record.[33]

If the ALJ decides not to credit the claimant's testimony as to his subjective symptoms, the ALJ must articulate explicit and adequate reasons for doing so or the record must be obvious as to the credibility finding.[34]  While the ALJ does not have to cite particular phrases or formulations, broad findings that a claimant was incredible and could work are, alone, insufficient for the Court to conclude that the ALJ considered the claimant's medical condition as a whole.[35]  The ALJ's articulated reasons must also be supported by substantial evidence.[36]  The Court will not disturb a properly articulated credibility finding that is supported by substantial evidence.[37]  The failure to articulate reasons for discrediting a claimant's subjective testimony, however, requires that the testimony be accepted as true and becomes grounds for remand where credibility is critical to the outcome of the case.[38]

In this case, the ALJ determined that Plaintiff had a medically-determinable impairment that could reasonably be expected to produce his symptoms and, therefore, the ALJ evaluated the intensity and persistence of Plaintiff's symptoms in determining how they limit his capacity for work, as reflected in the records and hearing testimony.[39]

---

[33] Id. § 404.1529(c)(4).

[34] See Foote, 67 F.3d at 1561–62.

[35] Id. at 1562.

[36] Jones v. Dep't of Health & Human Servs., 941 F.2d 1529, 1532 (11th Cir.1991).

[37] Foote, 67 F.3d at 1562.

[38] Id.

[39] See 20 C.F.R. 404.1529( c )(1)-(2).

The ALJ concluded that Plaintiff's complaints were not credible to the extent they are

inconsistent with the RFC.  (R. 19.)  The ALJ went on to discuss specific additional

evidence that supports his credibility findings.

The ALJ expressly discussed and relied upon the medical evidence to support

his conclusions regarding Plaintiff's credibility.  For example, the ALJ wrote:

> [T]he medical evidence does not support the severity of the claimant's
> symptoms or limitations as alleged.  The office visit notes reflect
> numerous occasions on which the claimant did not . . . specify any
> particular complaint, which contrasts with the current claim of ongoing,
> disabling symptoms since the alleged onset date.  The claimant
> underwent an aortic valve replacement in September 2003, yet treatment
> records reflect no significant complaints of cardiac pain or limitations from
> the claimant despite his frequent medication noncompliance.  Recent
> examination show no complaints of muscoskeletal pain or impairments.
> Although the claimant has received treatment for the allegedly disabling
> impairments, that treatment has been essentially routine and conservative
> in nature.  The medical evidence of record reflects minimal objective
> findings of disabling limitations, and no history of surgery or injections for
> relief of any of the alleged conditions.  The claimant has alleged disabling
> limitations from ankle pain, but the consultative examiner noted the
> claimant was able to ambulate without an assistive device. The record
> reveals that the claimant failed to follow-up on recommendations made by
> the treating doctor, which suggests that the symptoms may not have been
> as serious as he had alleged in connection with this application and
> appeal.  The claimant has a long history of medication non-compliance.
> In addition, the claimant has been advised by his doctor on numerous
> occasions to stop smoking and alcohol consumption, yet the claimant
> continues to use these substances.

(R. 19-20.)

As the ALJ pointed out, Plaintiff had worked only sporadically prior to the alleged

disability onset date, which suggested another reason for his continuing unemployment

besides the inability to work.  The ALJ found that his work history did not lend "great

support" to his credibility. The ALJ noted that Plaintiff has sought other jobs in the

period since his alleged onset date, thus "at least representing" that he had the ability to

work.  Plaintiff also failed to follow-up on recommendations made by his treating doctor, which the ALJ concluded strongly suggested that his symptoms may not be so serious as to be totally disabling.[40]  (R. 19.)

The ALJ also assessed Plaintiff's credibility by contrasting his complaints of disabling symptoms to his daily activities.[41]   In this regard the ALJ stated:

> The severity of the symptoms and the alleged effect on function is not entirely consistent with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alternations of usual behavior or habits.  The claimant testified that he is able to perform self-care, vacuum, dust, do dishes, do laundry, make simple meals, and can lift and carry 40 to 45 pounds.  The claimant testified that he has worked since the alleged onset date as caterer and was on his feet for three to four hours at a time.  Although the claimant worked at levels below SGA, his ability to perform this work shows good functioning.

(R. 19.)

As the ALJ observed Plaintiff's testimony about his activities of daily living are at odds with his complaints of disabling symptoms that preclude him from all work. Plaintiff stated that he could lift forty to forty-five pounds and testified that he was seeking full time work despite the fact that Plaintiff alleged he could not work.

Moreover, the office visits of his medical treatment reflect many instances where Plaintiff did not identify any problems. This evidence stands in stark contrast to Plaintiff's position that he has had disabling symptoms since the date of onset which precludes him from working. Other medical records disclose normal findings on

---

[40]  See Castel v. Comm'r of Soc. Sec., 355 F. App'x 260, 265 (11th Cir. 2009) (citing Watson v. Heckler, 738 F. 2d 1169, 1173 (11th Cir. 1984) for the "finding that a claimant's failure to seek medical treatment is relevant in assessing credibility").

[41]  20 C.F.R. § 404.1529(c)(3)(i).

examination as late as 2011, which again are in stark contrast to Plaintiff's allegations of disabling symptoms. For example, the notes from the November 2011 examination reflect that Plaintiff has full range of motion in all extremities and full strength. During the examination the next month in December 2011 the notes reflect that Plaintiff had no muscular skeletal complaints nor where there any objective findings supporting Plaintiff's claims of disabling symptoms. Lastly, the entirely of the treatment notes reflect that Plaintiff received conservative treatment only, which included only the use of non-narcotic medications.

Accordingly, contrary to Plaintiff's position that the ALJ's credibility finding was "meaningless boilerplate," a review of the ALJ's decision discloses that the ALJ discussed specific evidence he considered and relied upon in concluding that Plaintiff's complaints were not fully credible.  Therefore, the Court concludes that the ALJ's credibility finding was consistent with prevailing law and was supported by specifically identified substantial evidence. Thus, there is no reason for the Court to disturb this finding.

## V.  CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** at Gainesville, Florida this 4th day of December 2014.


*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

**<u>NOTICE TO THE PARTIES</u>**

       **A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**